**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

MIKAYLA LLOYD, *
14112 Oxford Road
Galena, Maryland 21635, *

Plaintiff, * Case No.:

v. * **JURY TRIAL DEMANDED**

RIVEREDGE, LLC *
1455 Cayotes Corner Road
Chesapeake City, Maryland 21915, *

Serve On: *
CSC-Lawyers Incorporating Service Co.
7 Saint Paul Street, Suite 820 *
Baltimore, Maryland 21202
*
Defendant.

* * * * * * * * * * * * *

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Mikayla Lloyd ("Plaintiff" or "Ms. Lloyd"), by her undersigned counsel, hereby sues Defendant Riveredge, LLC ("Riveredge" or "Defendant"), and states in support:

## NATURE OF THE ACTION

1. This is an action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.*, and Maryland common law, for compensatory damages arising from the unlawful discrimination in her employment on the basis of Ms. Lloyd's sex, hostile work environment, the retaliation against Ms. Lloyd following her complaints regarding said discrimination, and for Ms. Lloyd's constructive discharge.

2. The employment practices alleged to be unlawful were committed at Riveredge Stable in Chesapeake City Maryland, which is within the jurisdiction of the United States District Court for the District of Maryland.

3. This Court has subject matter jurisdiction over the claims asserted herein pursuant to 28 U.S.C. §§ 1331, 1343, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 to consider claims arising under state law.

4. This Court has personal jurisdiction because all parties reside in the District, conduct business in the District, and the unlawful actions giving rise to the instant claims occurred within the District.

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the events giving rise to suit occurred in this judicial District.

**PARTIES**

6. Ms. Lloyd is a United States citizen residing in Maryland, and can be contacted for the purposes of this litigation through her counsel, David Daneman, Allen E. Honick, and Whiteford, Taylor & Preston, LLP, 7 Saint Paul Street, Baltimore, Maryland 21202.

7. Defendant Riveredge, LLC is a Maryland limited liability company doing business in and duly licensed to do business in Maryland, and may be served with process through its resident agent, CSC-Lawyers Incorporating Service Co., 7 Saint Paul Street, Suite 820, Baltimore, Maryland 21202.

8. On information and belief, Defendant has employed at least 15 employees at all relevant times.

**FACTS COMMON TO ALL COUNTS**

9. Ms. Lloyd is a female and was 22 years old at all relevant times.

10. Ms. Lloyd began working for the Defendant in the position of stable hand in May of 2018. At all relevant times, Ms. Lloyd was acting in the scope of her employment with the Defendants.

11. At all relevant times, Patrick Lankford was a supervisor for the Defendant with the authority to hire and fire employees who reported to him. Defendant is vicariously liable for his harassing conduct.

12. Ms. Lloyd worked without issue from May until early-July 2018.

13. On or about July 9, 2018, a co-worker named Victor Cisneros, began making inappropriate comments to Ms. Lloyd. Mr. Cisneros would call Ms. Lloyd "mi Corazon" ("my heart" in Spanish), and would cat-call Ms. Lloyd in front of other employees as she walked by. Although this behavior made Ms. Lloyd uncomfortable, she chose to ignore the situation hoping that it would just stop.

14. Throughout July 2018, Mr. Cisneros continued making unwanted advances toward Ms. Lloyd. He would peruse Ms. Lloyd's Facebook page outside of work and then comment, in front of other employees, about Ms. Lloyd's tattoos and about her appearance in a bathing suit. Mr. Cisneros also repeatedly commented on Ms. Lloyd's sexual relationship with her fiancé, once asking, "Are you going to have sex with your fiancé tonight?" Mr. Cisneros also told Ms. Lloyd that he wanted to buy her a present and asked what kind of panties she preferred. Each time Mr. Cisneros made untoward and inappropriate comments, Ms. Lloyd advised him: "Victor, that's very inappropriate. I have a fiancé. You have a wife. And you are making me very uncomfortable."

15. On or about July 23, 2018, Mr. Cisneros approached Ms. Lloyd as she worked alone in a feed room. He told Ms. Lloyd that he bought her a present and asked what time she got off of work. Ms. Lloyd told him to "get out." Mr. Cisneros left the room, but waited for Ms. Lloyd to get off of work and then tried to hand her a small giftwrapped box, which Ms. Lloyd refused to accept.

16. When Ms. Lloyd returned to work the next day, Mr. Cisneros was visibly angry and confronted her about not accepting the gift. Mr. Cisneros' anger persisted over the next several days.

17. Then, on the morning of July 30, 2018, Ms. Lloyd was along in the stable kitchen when Mr. Cisneros entered. He said something in Spanish that Ms. Lloyd did not understand. He then grabbed Ms. Lloyd's arm and started making a massaging motion. Ms. Lloyd pulled away and told Mr. Cisneros to stop. He did not stop. Instead, he moved around Ms. Lloyd and dragged his hand from her arm to the small of her back/waist line and started massaging that area. Ms. Lloyd yelled "Stop!" and pulled away. He did not stop. Another coworker, Jesus Solis, entered the kitchen. Only then did Mr. Cisneros pull away from Ms. Lloyd.

18. Ms. Lloyd reported this incident to her manager, Rachel Clawson. Ms. Clawson relayed the information to the stable manager, Pat Lankford. Ms. Lawson and Mr. Lankford set up a meeting with Ms. Lloyd and another stable manager, Keri Allen. In that meeting, Ms. Lloyd told the three supervisors everything that had happened with Mr. Cisneros since the beginning of July. Mr. Lankford then asked Ms. Lloyd to step out of the room. Mr. Lankford eventually came out and told Ms. Lloyd to take the rest of the day off.

19. When Ms. Lloyd returned home that evening, she received a text message from Mr. Lankford asking, "Is there any possibility that [Mr. Cisneros] accidentally touched you in any way as he was trying to get around you in the small kitchen?" To which Ms. Lloyd replied, "Not at all."

20. The next morning (July 31), Mr. Lankford asked Ms. Lloyd to write a statement describing the incident with Mr. Cisneros. Mr. Lankford further requested that Ms. Lloyd wait to report to work until Ms. Clawson arrived.

21. Ms. Lloyd waited to report for work on July 31st until she knew that Ms. Clawson had arrived. Upon her arrival, Ms. Lloyd noticed Mr. Cisneros vehicle at the main barn. Disturbed that she would be alone with Mr. Cisneros, Ms. Lloyd drove to the east barn and found Ms. Clawson. Ms. Clawson, however, told Ms. Lloyd to return to the main barn, stating: "I guess no one has spoken to you yet. This is just how it is going to be. You and Mr. Cisneros are just going to have to work together because it is all he said/she said." Ms. Lloyd immediately texted Mr. Lankford and advised him that she was being forced to work in a confined space with Mr. Cisneros. Mr. Lankford then came down to the east barn to speak with Ms. Clawson and Ms. Lloyd.

22. During that conversation, Ms. Lloyd expressed her concerns about working in the same barn with Mr. Cisneros just one day after he had assaulted her. Mr. Lankford admitted that Mr. Solis witnessed Mr. Cisneros touching Ms. Lloyd, but that Mr. Solis claimed that Ms. Lloyd appeared happy during that interaction. Mr. Lankford asked Ms. Lloyd if she wanted to quit her job, to which Ms. Lloyd replied, "No," but that she could not work in the same confined space with Mr. Cisneros. Mr. Lankford told Ms. Lloyd that she was too upset to continue working and sent her home.

23. On the evening of July 31, Mr. Lankford sent Ms. Lloyd a series of text messages questioning her ability to continue working at Riveredge. Mr. Lankford explained Riveredge's conclusion that the incident with Mr. Cisneros was a "he said, she said." Mr. Lankford further stated that steps were being taken to ensure that Mr. Cisneros and Ms. Lloyd would not be at work alone together. But then, Mr. Lankford said:

> Unfortunately after hearing what you said this morning that you could not work with Victor around you, that you could not do barn check, it sounds to me that you have made your decision that you can no longer be employed here being we were going to keep Victor and you. Therefore if that is what you were saying that you can no longer work for Riveredge because your job description is for you to

> work at the barn and we need you to do barn check. Since there is no evidence for either one of you there's no proof of evidence either way. Though we take it very serious [sic] and though we were going to incorporate various things to help manage the situation, if what you said this morning stands that you' re not going to be able to work anywhere near Victor, it sounds like to me that you' re quitting us. If that' s the case and it sounds like it, then what I would say is I will give you severance pay for this entire week and I would thank you for your time here and wish you the very best in everything you do. I had no plans of letting you go, but it seems you have made that decision.

To which Ms. Lloyd replied:

> You must have misunderstood, I'm not quitting. I didn't want you take what I said this morning that way which is why I made sure to tell you that I need/want this job. This is a very uncomfortable situation for me and I was not expecting for him to be there today so soon after our discussion. I' m still very uncomfortable about the whole situation but I will continue to work in a professional manner as I always have with the reassurance that if anything happens in the future it will be dealt with swiftly. I will continue to do barn checks as requested I'll just make sure to take precautions.

To which Mr. Lankford responded:

> I did not miss [sic] understand you at the east barn. Rachel and I were listening to you very carefully and you were very distraught. You said things like you couldn't work around him. You did say that you'd be very uncomfortable I this situation. Later you told me you couldn't understand why he was here. You said all kinds of things like that this morning and I' m saying for your safety, for the horses [sic] safety, for the future of everybody I don' t think you' re going to be able to do this job. You said nothing keeps you up at night but you cried all night over this. You said you have picked up body parts out of a car before and you were able to sleep at night but you weren't able to sleep at night over this. How are you going to be able to work here. That's exactly what you said at the east barn this morning.
> I believe that something bad can happen, the wrong grain the wrong mixture of food for a horse, or you get kicked.
> If you had been standing where I was standing listening to you and watching you, you would agree with me that you were very very distraught saying things like I can't imagine being around him again. I believe you were telling the truth about how you feel. Therefore I do not see how this can continue. Based upon your words and actions this morning I do not see how you can continue to work at Riveredge in a safe manner.

To which Ms. Lloyd replied:

Am I being fired? I'm not quitting over this.

24. Mr. Lankford's attempts at minimizing the touching incident, and his suggestion that Ms. Lloyd was no longer capable of continuing her employment with the Defendant because she was upset that the Defendant was still forcing her to work in the same confined spaces with Mr. Cisneros caused Ms. Lloyd to feel demeaned, disrespected, bullied, and fearful for her job.

25. Ms. Lloyd had a subsequent conversation with Riveredge's human resources department who assured her that the touching incident was still under investigation.

26. After the text conversation with Mr. Lankford, Ms. Lloyd took vacation time from Riveredge.

27. When Ms. Lloyd returned to work on August 13, 2018, she was segregated from every other employee at Riveredge. Ms. Lloyd felt exiled, isolated, and punished for reporting that her co-worker sexually assaulted her.

28. Ms. Lloyd became fearful that Riveredge as a corporate entity, and the individual managers and supervisors at her stable did not take her complaint seriously and, in fact, punished her for reporting the incident. Indeed, Mr. Lankford's text message comments made it clear to Ms. Lloyd that Riveredge sought to disparage her and characterize her fear of additional unwanted physical contact as Ms. Lloyd stating that she could no longer work at Riveredge.

29. Riveredge then required its employees to watch a sexual harassment training video, which Mr. Cisneros refused to watch. Mr. Cisneros resigned from Riveredge shortly thereafter.

30. After Mr. Cisneros quit, Ms. Lloyd believed that her conditions of employment would return to normal. However, that was not the case.

31. Beginning on August 13, 2018, and continuing through the fall of that year, Mr. Lankford targeted Ms. Lloyd for complaining about the touching incident, and for further requesting that she not be forced to work in the same confined space with Mr. Cisneros. This

behavior continued even after Mr. Cisneros quit his position. Mr. Lankford took every opportunity to belittle Ms. Lloyd. He criticized Ms. Lloyd in front of Riveredge clients. He berated Ms. Lloyd in front of Riveredge co-workers.

32. From mid-August until on or about November 30, 2018, Mr. Lankford frequently screamed and yelled at Ms. Lloyd, often in front of co-workers and clients. This behavior embarrassed and humiliated Ms. Lloyd, particularly when Mr. Lankford made these comments in front of other people.

33. Mr. Lankford would also make sexist remarks to Ms. Lloyd like, “If a woman wears a short skirt and a man stares at her, whose fault is that?” Ms. Lloyd asked Mr. Lankford to stop and stated that these remarks made her feel uncomfortable, but Mr. Lankford ignored those requests.

34. Mr. Lankford asked Ms. Lloyd’s co-workers if they knew anything about Ms. Lloyd’s previous employment, or if she had made a sexual assault allegation in the past. Mr. Lankford encouraged Riveredge employees to examine Ms. Lloyd’s private social media posts in an effort to “dig up dirt” on Ms. Lloyd. Mr. Lankford threatened Riveredge employees with termination if they spoke to Ms. Lloyd during the touching incident investigation. Mr. Lankford also directed Riveredge employees to not text or email Ms. Lloyd so as to not leave a paper trail of any such communications.

35. Mr. Lankford’s wife, Yvonne, who also worked at Riveredge, participated in these behaviors, often telling Riveredge employees to keep a close eye on Ms. Lloyd as she performed her daily duties. Mr. and Mrs. Lankford’s actions caused Ms. Lloyd to believe that Riveredge was seeking some justification to terminate her employment. These behaviors continued from mid-August through October 2018.

36. As a result of Mr. Lankford's apparent vendetta against Ms. Lloyd, Ms. Lloyd was forced to endure a working environment pervaded by discrimination based on her sex and other inappropriate and/or unlawful conduct by Defendant's management, including Mr. Lankford. Defendant condoned, tolerated, and failed to act with respect to all such conduct.

37. On October 30, 2018, Mr. Lankford's conduct toward Ms. Lloyd reached new levels of hostility. That day, Mr. Lankford confronted Ms. Lloyd in the main barn after the horse feed ran out because Ms. Lloyd's supervisor had neglected to re-order same. Irate and aggressive, Mr. Lankford began yelling at Ms. Lloyd and another co-worker with clenched fists stating, "We look really stupid." Mr. Lankford then pointed his finger in the co-worker's face and said, "Can't you both just stand there and hush up!" Ms. Lloyd told Mr. Lankford that he was being aggressive and disrespectful and that his behaviors were scaring her, to which Mr. Lankford replied, "Oh I'm mad? This is yelling? Oh no, you haven't seen me mad! I'm sorry I'm not as good of a man as your husband. But I'm not about to have three WOMEN coming at me while I am trying to explain something!" Mr. Lankford then stormed off.

38. Mr. Lankford's abusive outburst caused Ms. Lloyd to feel threatened, humiliated, disrespected, hurt, sad, fearful for her job, and offended by this treatment.

39. The next day, Ms. Lloyd reported this incident to her direct supervisor, Keri Allen, and to a human resources representative named Lana. Ms. Lloyd also provided a detailed verbal statement to Lana about Riveredge and Mr. Lankford's adverse employment actions since the touching incident with Mr. Cisneros. Lana asked Ms. Lloyd to commit her statement to writing and turn it in to Ms. Allen. Lana also asked several other Riveredge employees to provide written statements about Ms. Lloyd's allegations and to turn those statements in to Ms. Allen.

40. However, when Ms. Lloyd tried to turn in her written statement, Ms. Allen advised that she could not accept the statement and she could not discuss the situation any longer with Riveredge employees because the human resources department forbade her from doing so. Ms. Allen further stated that Riveredge's formal policy was now that any complaints about conditions of employment must be turned in directly to Mr. Lankford.

41. Ms. Lloyd felt trapped and scared when she was told that any complaints about Mr. Lankford must be submitted to Mr. Lankford alone, and that the human resources department would no longer involve itself in receiving those complaints.

42. Ms. Allen similarly refused to accept any statements from the other Riveredge employees and, on information and belief, Ms. Allen actually shredded those written statements.

43. When she learned that Ms. Allen shredded the co-workers' written statements, Ms. Lloyd became fearful that Mr. Lankford and Riveredge would blame the previous day's incident on her and take this opportunity to fire her.

44. Defendant never provided Ms. Lloyd with any update concerning her complaints about Mr. Lankford and his discriminatory and hostile behavior. In fact, on information and belief, Defendant promoted Mr. Lankford after the October 30th incident to a position within the human resources department.

45. Defendant likewise never produced a report to Ms. Lloyd following any of her complaints, beginning with the touching incident with Mr. Cisneros, and continuing through the October incident with Mr. Lankford.

46. The hostile and retaliatory work environment continued through November 2018. Ms. Lloyd no longer felt safe at work. She felt unprotected by both her direct supervisors and by the Defendant. The chain of events following the touching incident—including how that incident was handled—made Ms. Lloyd's life miserable, both at work and at home. Ms. Lloyd

developed physical symptoms from the anxiety and stress that the hostile work environment created.

47. Moreover, from mid-August through November 30, 2018, Riveredge segregated Ms. Lloyd while she was at work, forcing her to work alone in a barn with little to no contact with her coworkers. Riveredge, and specifically Mr. Lankford, among others, would yell at and threaten Ms. Lloyd if she left that barn for any reason, even to refill her water bottle.

48. Ultimately, on November 30, 2018, Defendant constructively discharged Ms. Lloyd because of her sex (female). Ms. Lloyd resigned in response to the Defendant's repeated failures to stop the ongoing harassment and hostile work environment. Defendant knowingly created and permitted working conditions that Ms. Lloyd reasonably viewed as intolerable and that caused her to resign.

49. Mr. Lankford's aforementioned conduct directed at Ms. Lloyd was motivated by Ms. Lloyd's sex (female), as frequently proclaimed by Mr. Lankford throughout Ms. Lloyd's employment with the Defendant; and by Mr. Lankford's perception that Ms. Lloyd no longer wished to be employed with the Defendant, despite her repeated statements to the contrary.

50. The effect of the aforementioned practices has been to deprive Ms. Lloyd of equal opportunities and otherwise adversely affected her status as an employee.

51. The unlawful employment practices described herein were intentional.

52. The unlawful employment practices described herein were done with malice or with reckless indifference to Ms. Lloyd's federally protected rights.

## **<u>EXHAUSTION OF ADMINISTRATIVE REMEDIES</u>**

53. On April 10, 2019, Ms. Lloyd filed a Charge with EEOC on April 10, 2019, alleging that the Defendant had committed an unlawful employment practice against her between July and November 2018 in violation of Title VII of the Civil Rights Act of 1964.

54. On August 6, 2020, the EEOC provided Ms. Lloyd with a Notice of Right to Sue. A true and correct copy of the Notice is attached as **EXHIBIT A**.

55. Accordingly, Ms. Lloyd has exhausted her administrative remedies, and this Court has subject matter jurisdiction over the claims asserted.

**COUNT ONE**
**(Sex-Based Discrimination in Violation of Title VII)**

56. Ms. Lloyd incorporates the allegations contained in the previous paragraphs as if fully set forth herein.

57. Ms. Lloyd is a female protected by Title VII's prohibition against discrimination on the basis of gender or sex.

58. Defendant is liable for discriminatory conduct by its employees under the theory of *respondeat superior*.

59. By his conduct, Mr. Lankford engaged in sex-based discrimination toward Ms. Lloyd in violation of Title VII.

60. Members of Defendant's management were often present and observed Mr. Lankford's behavior toward, and treatment of Ms. Lloyd, and Ms. Lloyd reported Mr. Lankford's conduct to Defendant's human resources and legal departments, but Defendant took no action to stop that conduct and to prevent its future occurrence.

61. The hostile work environment created by Mr. Lankford's discrimination against Ms. Lloyd was sufficiently severe and pervasive that it altered the terms, conditions, and privileges of her employment in violation of Title VII, and forced Ms. Lloyd to involuntarily resign from her employment with the Defendant.

62. As a direct and proximate result of Mr. Lankford's unlawful conduct toward Ms. Lloyd, Ms. Lloyd has suffered, and will continue to suffer, actual damages including, but not

limited to back pay, front pay, lost benefits, loss of earning capacity, damage to reputation, anxiety, sleeplessness, humiliation, embarrassment, and other emotional distress.

63. Because Defendant's treatment of Ms. Lloyd was willful and/or in reckless disregard of Ms. Lloyd's statutory rights, Ms. Lloyd is further entitled to an award of punitive damages.

**COUNT TWO**
**(Retaliation in Violation of Title VII)**

64. Ms. Lloyd incorporates the allegations contained in the previous paragraphs as if fully set forth herein.

65. Defendant, through Mr. Lankford, retaliated against Ms. Lloyd for her complaints concerning the touching incident with Mr. Cisneros, and the ongoing discriminatory treatment by Mr. Lankford, in violation of Title VII.

66. Such retaliation included, but was not limited to, affected Ms. Lloyd's ability to perform her job by, *inter alia*, segregating her from her co-workers, changing her work duties, belittling her in front of co-workers and clients, refusing to investigate her valid complaints of a hostile work environment, by encouraging her co-workers to "dig up dirt" on Ms. Lloyd in an effort to find cause for her termination, and generally, by ensuring that Ms. Lloyd's work environment remained increasingly hostile, offensive, and intolerable.

67. Defendant condoned and ratified Mr. Lankford's ongoing harassment and discriminatory treatment of Ms. Lloyd by failing to investigate her valid complaints, and by promoting Mr. Lankford to a human resources position in the middle of his harassing and retaliatory treatment of Ms. Lloyd.

68. As a direct and proximate result of the aforementioned unlawful conduct, Ms. Lloyd has suffered, and will continue to suffer, actual damages including, but not limited to back

pay, front pay, lost benefits, loss of earning capacity, damage to reputation, anxiety, sleeplessness, humiliation, embarrassment, and other emotional distress.

69. Because Defendant's treatment of Ms. Lloyd was willful and/or in reckless disregard of Ms. Lloyd's statutory rights, Ms. Lloyd is further entitled to an award of punitive damages.

**COUNT THREE**
**(Constructive Discharge)**

70. Ms. Lloyd incorporates the allegations contained in the previous paragraphs as if fully set forth herein.

71. As described herein, Defendant, through Mr. Lankford, constructively discharged Ms. Lloyd by making her work conditions so intolerable that a reasonable person in Ms. Lloyd's position would have felt compelled to resign.

72. Indeed, Ms. Lloyd actually resigned from her position on November 30, 2018, despite enjoying her job and wanting to remain employed with the Defendant, as a direct result of the hostile, discriminatory, and retaliatory treatment described herein.

73. Ms. Lloyd felt so compelled because, *inter alia*, the hostile work environment was getting progressively worse over time with Mr. Lankford berating and demeaning Ms. Lloyd almost on a daily basis, by Mr. Lankford repeatedly intimating to Ms. Lloyd that she appeared to be quitting her job because she was too distraught, and because the Defendant refused to investigate and react to Ms. Lloyd's repeated complaints of this unlawful conduct.

74. In fact, on information and belief, Defendant advised its employees at Riveredge to shred documentation relating to Ms. Lloyd's repeated complaints, thus ensuring that the work environment remained unchanged.

75. As a direct and proximate result of Defendant's failures to intervene, Ms. Lloyd was forced to resign from her employment with the Defendant on November 30, 2018. As a result, Ms. Lloyd has suffered, and will continue to suffer, actual damages including, but not limited to back pay, front pay, lost benefits, loss of earning capacity, damage to reputation, anxiety, sleeplessness, humiliation, embarrassment, and other emotional distress.

76. Because Defendant's treatment of Ms. Lloyd was willful and/or in reckless disregard of Ms. Lloyd's statutory rights, Ms. Lloyd is further entitled to an award of punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Mikayla Lloyd requests that this Court enter judgment in her favor and against the Defendant, Riveredge, LLC, and:

(1) Award Plaintiff compensatory and general damages and economic losses in an amount to be determined by the jury;

(2) Award Plaintiff punitive damages in an amount to be determined by the jury;

(3) Award Plaintiff reasonable attorneys' fees and expenses incurred in connection with this action;

(4) Award prejudgment interest on all monetary relief to the maximum extent permitted by law; and

(5) Award such other and further relief as this Court may deem appropriate.

Respectfully submitted,

David Daneman, Federal Bar No.: 06976
Allen E. Honick, Federal Bar No.: 19822
WHITEFORD, TAYLOR & PRESTON, L.L.P.
Seven St. Paul Street, Suite 1500
Baltimore, Maryland 21202-1636
(410) 347-8700
ddaneman@wtplaw.com
ahonick@wtplaw.com
*Attorneys for Plaintiff, Mikayla Lloyd*

*11541061*