IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MIKAYLA LLOYD,

    Plaintiff,

v.

RIVEREDGE OPERATING
COMPANY, LLC,

    Defendant.

Civil Action No.: GLR-20-3162

### MEMORANDUM OPINION

THIS MATTER is before the Court on Defendant Riveredge Operating Company, LLC's ("Riveredge") Motion to Dismiss Plaintiff Mikayla Lloyd's Complaint (ECF No. 4). The Motion is ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2018). For the reasons set forth below, the Court will deny the Motion.

### I.    BACKGROUND[1]

**A.    Factual Background**

Lloyd began working for Riveredge as a stable hand in May 2018. (Am. Compl. ¶ 10, ECF No. 6). She worked without incident until early July 2018. (Id. ¶ 12). On or about July 9, 2018, Lloyd's coworker, Victor Cisneros, began subjecting Lloyd to inappropriate sex-based comments, including calling her "my heart" in Spanish and cat-calling her in front of other employees. (Id. ¶ 13). Although the behavior made Lloyd uncomfortable, she

---

[1] Unless otherwise noted, the Court takes the following facts from Lloyd's Complaint and accepts them as true. See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (citations omitted).

initially chose to ignore it. (Id.). His advances and inappropriate behavior continued over the course of the month, including by commenting on her appearance in a bathing suit and asking her about her sexual relationship with her fiancé. (Id. ¶ 14). Lloyd began objecting to Cisneros's advances and telling him that he was making her uncomfortable. (Id.).

On or about July 23, 2018, Cisneros approached Lloyd while she was working alone and told her that he had bought her a present. (Id. ¶ 15). Lloyd told him to leave the room, but later that day, he tried to hand her the present. (Id.). Lloyd refused to accept it. (Id.). Cisneros angrily confronted her the following day and continued to treat her in a hostile manner over the next several days. (Id. ¶ 16). On the morning of July 30, 2018, Cisneros entered the stable kitchen while Lloyd was there alone. (Id. ¶ 17). He grabbed her arm and began to massage it. (Id.). She pulled away and demanded that he stop, but he refused to do so. (Id.). Instead, he moved his hand to the small of her back and massaged her in that area. (Id.). Lloyd again demanded that he stop and he again refused. (Id.). Only after a coworker entered the kitchen did Cisneros pull away from Lloyd. (Id.).

Lloyd reported the incident to Rachel Clawson, her supervisor, who in turn relayed the information to Patrick Lankford, the stable manager. (Id. ¶ 18). Clawson, Lankford, and another manager met with Lloyd to discuss the incident. (Id.). Lloyd described the incident and the weeks-long campaign of harassment to which Cisneros had subjected her. (Id.). Lankford told her to take the rest of the day off. (Id.). Later that day, Lankford texted her to ask if it was possible that Cisneros had only "accidentally" touched her as he was trying to move around her in the kitchen. (Id. ¶ 19). Lloyd responded that that was not possible. (Id.).

Upon arriving at work the following morning, Lloyd saw Cisneros's vehicle at the barn. (Id. ¶ 21). Concerned about being alone with him, Lloyd drove to a separate barn and discussed his presence with Clawson. (Id.). Clawson informed her that "[t]his is just how it is going to be. You and Mr. Cisneros are just going to have to work together because it is all he said/she said." (Id.). Lloyd texted Lankford to object to the decision, and Lankford came to join Lloyd and Clawson. (Id.).

During the meeting, Lloyd expressed concerns about working with Cisneros. (Id. ¶ 22). Lankford asked her if she wanted to quit her job. (Id.). Lloyd said that she did not, but that she also could not work in a confined space with Cisneros. (Id.). Lankford sent her home. (Id.). That evening, Lankford sent Lloyd a series of text messages appearing to suggest that she should resign from Riveredge. (Id. ¶ 23). Among other things, Lankford wrote to her that:

> [I]t sounds to me that you have made your decision that you can no longer be employed here being we were going to keep Victor and you. Therefore if that is what you were saying that you can no longer work for Riveredge . . . if what you said this morning stands that you're not going to be able to work anywhere near Victor, it sounds like to me that you' re quitting us. If that's the case and it sounds like it, then what I would say is I will give you severance pay for this entire week and I would thank you for your time here[.]

(Id.). Lloyd replied that she was "not quitting" and that while she was "very uncomfortable about the whole situation," she would continue to do her job, but would "take precautions." (Id.). Lankford appeared reluctant to accept this response, and replied:

> I'm saying for your safety, for the horses [sic] safety, for the future of everybody I don't think you' re going to be able to do this job. . . . If you had been standing where I was standing

3

> listening to you and watching you, you would agree with me that you were very very distraught saying things like I can't imagine being around him again. I believe you were telling the truth about how you feel. Therefore I do not see how this can continue. Based upon your words and actions this morning I do not see how you can continue to work at Riveredge in a safe manner.

(Id.). Lloyd responded again to reiterate that she was "not quitting over this." (Id.). Following her conversation with Lankford, however, Lloyd took nearly two weeks of vacation leave. (Id. ¶ 26). Shortly after she returned, Cisneros resigned. (Id. ¶ 29).

After Lloyd returned to work on August 13, 2018, she found herself segregated from other employees. (Id. ¶ 27). Specifically, Riveredge forced Lloyd "to work alone in a barn with little to no contact with her coworkers," and Lankford "would yell at and threaten Ms. Lloyd if she left that barn for any reason, even to refill her water bottle." (Id. ¶ 47). Moreover, from that time until the end of November 2018, Lankford "took every opportunity" to belittle, criticize, and berate Lloyd. (Id. ¶ 31). During this period, "Lankford frequently screamed and yelled at Ms. Lloyd, often in front of co-workers and clients." (Id. ¶ 32). Lloyd alleges that this behavior occurred "almost on a daily basis." (Id. ¶ 73). Lankford also made sexist remarks in front of her, despite her requests that he stop doing so. (Id. ¶ 33). For instance, on October 30, 2018, Lankford shouted at Lloyd and a coworker, "Can't you both just stand there and hush up!" (Id. ¶ 37). Lloyd responded that Lankford was being "aggressive and disrespectful" and told him that his behavior was scaring her. (Id.). Lankford exclaimed, "[Y]ou haven't seen me mad! I'm sorry I'm not as good of a man as your husband. But I'm not about to have three WOMEN coming at me while I am trying to explain something!" (Id.).

4

During this period, Lankford began to seek out information about Lloyd's previous employment, including whether she had made previous allegations of sexual assault. (Id. ¶ 34). Lankford also directed other Riveredge employees to investigate Lloyd's social media accounts to see if they could unearth damaging information about her. (Id.). He instructed Riveredge employees to not text or email Lloyd. (Id.). Lankford's wife, Yvonne, another Riveredge employee, instructed Riveredge employees to "keep a close eye on" Lloyd while she was at work, which Lloyd understood was done in an effort to find a reason to terminate her. (Id. ¶ 35).

On October 31, 2018, Lloyd reported Lankford's outburst from the previous day to her direct supervisor, Keri Allen, and a human resources representative named Lana. (Id. ¶ 39). Lloyd also provided details to Lana concerning Lankford's other conduct since Lloyd reported the Cisneros incident. (Id.). Lana asked Lloyd to prepare and submit a written statement about her concerns. (Id.). When Lloyd brought her written statement to Allen, however, Allen refused to accept the statement. (Id. ¶ 40). Instead, Allen told Lloyd that she must convey any complaints relating to her employment directly to Lankford. (Id.). Lloyd declined to do so because the prospect of submitting the written report to Lankford made her feel "trapped and scared." (Id. ¶ 41). Lloyd notes that members of Riveredge management "were often present and observed Mr. Lankford's behavior toward, and treatment of Ms. Lloyd, and Ms. Lloyd reported Mr. Lankford's conduct to Defendant's human resources and legal departments[.]" (Id. ¶ 60).

As of November 30, 2018, Riveredge had not provided Lloyd with any update regarding her verbal report. (Id. ¶ 44). Lloyd alleges that she "developed physical

5

symptoms from the anxiety and stress" caused by her treatment at Riveredge. (Id. ¶ 46). Lloyd resigned from Riveredge on November 30, 2018. (Id. ¶ 48).

**B.     Procedural Background**

Lloyd filed a charge with the United States Equal Employment Opportunity Commission ("EEOC") on April 10, 2019. (Am. Compl. ¶ 53). The EEOC issued Lloyd a right-to-sue letter on August 6, 2020. (Id. ¶ 54). Lloyd filed her Complaint in this Court on October 30, 2020. (ECF No. 1). Riveredge filed a Motion to Dismiss on December 7, 2020. (ECF No. 4). Lloyd then filed an Amended Complaint on December 10, 2020. (ECF No. 6). The three-count Complaint alleges: sex-based hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII") (Count One)[2]; retaliation in violation of Title VII (Count Two); and constructive discharge (Count Three). (Id. ¶¶ 56–76). Lloyd seeks compensatory and general damages, economic losses, punitive damages, attorneys' fees and costs, and prejudgment interest on all monetary relief. (Id. at 15).

---

[2] Lloyd does not caption Count One as a hostile work environment claim in the Amended Complaint. (See Am. Compl. at 12). In her Opposition, however, she clarifies that Count One "should be titled 'hostile work environment.'" (Pl.'s Resp. Opp'n Def.'s Mot. Dismiss ["Opp'n"] at 2 n.2, ECF No. 9). Riveredge does not appear to contest this reframing of Lloyd's claims and, in any event, "the caption on a pleading does not constrain the court's treatment of a pleading." Sanders v. Yeager, 57 F.App'x 381, 382 (10th Cir. 2003) (citations omitted); see also Hamlin v. Warren, 664 F.2d 29, 30 (4th Cir. 1981) ("A federal court has the inherent power to fashion appropriate relief. It is not constrained by the pleader's request for relief."). Accordingly, to the extent the Court finds that Lloyd has made out a claim for hostile work environment, it will allow that claim to survive Riveredge's Motion.

On December 11, 2020, the Court approved Riveredge's request to deem its Motion as responsive to the Amended Complaint. (ECF No. 8). Lloyd filed an Opposition on February 1, 2021. (ECF No. 9). Riveredge filed a Reply on February 16, 2021. (ECF No. 10).

## II.   STANDARD OF REVIEW

The purpose of a Rule 12(b)(6) motion is to "test[ ] the sufficiency of a complaint," not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." King v. Rubenstein, 825 F.3d 206, 214 (4th Cir. 2016) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999)). A complaint fails to state a claim if it does not contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), or does not "state a claim to relief that is plausible on its face," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555). Though the plaintiff is not required to forecast evidence to prove the elements of the claim, the complaint must allege sufficient facts to establish each element. Goss v. Bank of Am., N.A., 917 F.Supp.2d 445, 449 (D.Md. 2013) (quoting Walters v. McMahen, 684 F.3d 435, 439 (4th Cir. 2012)), aff'd, 546 F.App'x 165 (4th Cir. 2013).

In considering a Rule 12(b)(6) motion, a court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. Albright v. Oliver, 510 U.S. 266, 268 (1994); Lambeth v. Bd. of Comm'rs of Davidson Cnty., 407 F.3d 266, 268 (4th Cir. 2005) (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). But the court need not accept unsupported or conclusory factual allegations devoid of any reference to actual events, United Black Firefighters v. Hirst, 604 F.2d 844, 847 (4th Cir. 1979), or legal conclusions couched as factual allegations, Iqbal, 556 U.S. at 678.

### III.   ANALYSIS

#### A.   Constructive Discharge (Count Three)

Lloyd alleges that Riveredge constructively discharged her. Although Lloyd frames her constructive discharge claim as Count Three of her Complaint, the Court addresses it first because constructive discharge is not a standalone claim. Rather, constructive discharge is an adverse action which can fulfill that element of her discrimination or retaliation claims. See Crockett v. SRA Int'l, 943 F.Supp.2d 565, 576 (D.Md. 2013) ("[C]onstructive discharge is not a standalone 'claim.'"); Cohens v. Md. Dep't of Hum. Res., No. WDQ-11-3419, 2013 WL 3944451, at *5 n.37 (D.Md. July 30, 2013) ("Constructive discharge is not a standalone claim, but rather can satisfy the element of an adverse employment action in a substantive claim.") (internal quotation marks and citations omitted); Rosa v. Bd. of Educ. of Charles Cnty., Md., No. AW-11-2873, 2012 WL 3715331, at *10 (D.Md. Aug. 27, 2012) ("Constructive discharge is not a claim per se."); Reed v. Action Prods., Inc., No. JKB-12-409, 2012 WL 2711051, at *2 (D.Md. July 6,

8

2012) ("Constructive discharge, however, is not an independent basis for relief.") (citation omitted); Weng v. Scalia, No. 1:15-CV-00504-BJR, 2020 WL 3832950, at *2 n.4 (D.D.C. July 8, 2020) ("Constructive discharge, however, is not an independent basis for liability under Title VII.") (citation omitted); see also Green v. Brennan, 136 S.Ct. 1769, 1776 (2016) (finding that a constructive discharge may serve in a discrimination claim as the "matter alleged to be discriminatory").[3] Although constructive discharge cannot proceed as a standalone cause of action, it may nonetheless serve as the underlying adverse action for Lloyd's hostile work environment and retaliation claims. Thus, the Court will review these allegations on their merits.

To establish a constructive discharge, "a plaintiff must show 'that [s]he was discriminated against by h[er] employer to the point where a reasonable person in h[er] position would have felt compelled to resign' and that she actually resigned." Evans v. Int'l Paper Co., 936 F.3d 183, 193 (4th Cir. 2019) (quoting Green, 136 S.Ct. at 1777). The conditions must go "beyond 'ordinary' discrimination." Id. (quoting Penn. State Police v. Suders, 542 U.S. 129, 147 (2004)). Courts evaluating constructive discharge claims must consider whether a plaintiff's workplace was so intolerable that she was compelled to resign under an objective, "reasonable person" standard. Heiko v. Colombo Sav. Bank, F.S.B., 434 F.3d 249, 262 (4th Cir. 2006) (citation omitted). "However, mere

---

[3] The Fourth Circuit has yet to expressly rule on the question of whether constructive discharge constitutes an independent cause of action. See, e.g., Perkins v. Int'l Paper Co., 936 F.3d 196, 203 n.1 (4th Cir. 2019) (noting lack of clarity in the district court regarding whether constructive discharge was a separate cause of action but declining to rule on the issue).

9

dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." Id. (quoting James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 378 (4th Cir. 2004)). Moreover, "[i]n assessing intolerability, the frequency of the conditions at issue is important." Evans, 936 F.3d at 193 (citation omitted). Thus, "[t]he more continuous the conduct, the more likely it will establish the required intolerability. On the other hand, when the conduct is isolated or infrequent, it is less likely to establish the requisite intolerability." Id. Finally, the Fourth Circuit has advised that courts should consider "the totality of the circumstances" in determining whether a resignation was, in fact, a constructive discharge. See Bodkin v. Town of Strasburg, Va., 386 F.App'x 411, 413 (4th Cir. 2010).[4]

Riveredge argues that "[a]t best," Lloyd alleges only that Lankford "raised his voice on occasion, criticized Plaintiff in front of co-workers and clients, and segregated Plaintiff from her co-workers at work." (Def.'s Mem. Supp. Mot. Dismiss ["Mot."] at 14, ECF No. 4-1). According to Riveredge, this conduct is not sufficient to meet the high bar of constructive discharge.

---

[4] The Court notes that both parties expend considerable effort arguing the so-called "deliberateness" prong of a constructive discharge allegation, i.e., whether the employer "deliberately" made the employee's working conditions intolerable. (See Def.'s Mem. Supp. Mot. Dismiss ["Mot."] at 13–14, ECF No. 4-1; Opp'n at 18–21). However, "'deliberateness' is no longer a component of a constructive discharge claim." E.E.O.C. v. Consol Energy, Inc., 860 F.3d 131, 144 (4th Cir. 2017). As the Fourth Circuit explained, "[t]he Supreme Court now has clearly articulated the standard for constructive discharge, requiring objective 'intolerability'—'circumstances of discrimination so intolerable that a reasonable person would resign,'—but not 'deliberateness,' or a subjective intent to force a resignation." Id. (quoting Green, 136 S.Ct. at 1779).

The Court disagrees. Lloyd's Amended Complaint alleges, inter alia, that Lankford and Riveredge: (1) repeatedly pressured her to quit because she reported sexual harassment; (2) after she reported the harassment, forced her to work alone in a barn, yelling at and threatening her whenever she left the barn; (3) on an almost daily basis, belittled, berated, and screamed at Lloyd in front of coworkers and clients; (4) made degrading, sex-based remarks to Lloyd, despite her requests to discontinue the behavior; and (5) instructed Lloyd's coworkers to find negative information about her and to monitor her actions in an effort to manufacture a pretext to terminate her. Lloyd alleges that she was subjected to this treatment constantly for a period of approximately five months. Moreover, when she could no longer take the abuse and sought to report it, Riveredge told Lloyd that the only individual to whom she could report the abuse was her primary abuser—the same individual who responded to her previous report of sexual harassment by pressuring her to quit her job. This mistreatment caused Lloyd to experience physical symptoms, including anxiety and sleeplessness. Viewed together, these facts are more serious than those presented in the cases Riveredge cites where courts found that plaintiffs had failed to establish a constructive discharge. See, e.g., Williams v. Giant Food Inc., 370 F.3d 423, 434 (4th Cir. 2004) (finding that plaintiff's allegations "that her supervisors yelled at her, told her she was a poor manager and gave her poor evaluations, chastised her in front of customers, and once required her to work with an injured back" were insufficient to establish a constructive discharge). The Court finds that these allegations give rise to a plausible interference that a reasonable individual subjected to this treatment over the period of several months could find these conditions intolerable and feel forced to resign.

11

For the reasons set forth above, the Court finds that Lloyd has adequately alleged that Riveredge constructively discharged her. Accordingly, the Court will deny Riveredge's Motion to Dismiss Lloyd's claim of constructive discharge, which the Court construes as an adverse action attaching to her other claims.

**B.     Hostile Work Environment (Count One)**

Lloyd alleges that Riveredge subjected her to a hostile work environment and constructively discharged her on the basis of her sex in violation of Title VII. In stating her hostile work environmental claim, Lloyd relies on many of the same facts that form the basis for her allegation of constructive discharge. This is appropriate. See Evans, 936 F.3d at 191–92 ("[T]he Supreme Court . . . has recognized such a combined hostile work environment constructive discharge claim referred to as a 'hostile-environment constructive discharge' claim." (citing Suders, 542 U.S. at 147)). "To establish a hostile-environment constructive discharge claim, a plaintiff must show the requirements of both a hostile work environment and a constructive discharge claim." Id. at 192 (citing Suders, 542 U.S. at 146–47). The Court has already found that Lloyd has adequately alleged a constructive discharge claim. Accordingly, the Court turns to the elements of a hostile work environment.

To establish a discriminatory hostile work environment claim, Lloyd "must demonstrate: (1) she experienced unwelcome harassment; (2) the harassment was based on her gender or race; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer." Evans, 936 F.3d at 192.

Because the Court finds that Lloyd has adequately pleaded the adverse action of constructive discharge sufficient to survive Riveredge's Rule 12(b)(6) Motion, it follows that she has adequately alleged that she experienced unwelcome harassment that was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere. See Evans, 936 F.3d at 193 (noting that in order to establish a constructive discharge, "the plaintiff must show 'something more' than the showing required for a hostile work environment claim"). In other words, Lloyd's allegations establishing a constructive discharge are more than enough to allege conduct that is sufficiently severe or pervasive to constitute a hostile work environment.[5] Moreover, Riveredge does not appear to contest Lloyd's allegations, (see Am. Compl. ¶ 60), that Lankford's conduct is imputable to Riveredge. Thus, it remains for the Court to determine whether Lloyd has adequately alleged that the conduct was based on her sex.[6] At bottom, the Court finds that Lloyd has

---

[5] The Court notes that Lloyd has alleged additional actions in support of her claim of a discriminatory hostile work environment—in particular, allegations relating to Riveredge's initial response to her report about Cisneros—that may not relate directly to her claim of constructive discharge. This Opinion should not be read to revise the Amended Complaint by narrowing Lloyd's hostile work environment claim to only a hostile-environment constructive discharge claim. The Court reads the Amended Complaint to allege both a hostile work environment and a hostile-environment constructive discharge claim. Indeed, it is possible that Lloyd will ultimately prevail on her hostile work environment claim while being unable to adduce evidence to meet the higher bar of constructive discharge. At the motion to dismiss stage, however, the Court's finding that Lloyd has presented sufficient allegations to make out a claim of constructive discharge is dispositive as to whether she has alleged severe and pervasive harassment for the purposes of her hostile work environment claim.

[6] Lloyd asserts in her Opposition that Riveredge did not contest this element in its Motion. (Opp'n at 5). The Court disagrees. Although Riveredge did not argue the point in the hostile work environment section of its brief, it spent several pages arguing the point in the discrimination section of the brief. (See Mot. at 7–10).

established this element and will deny Riveredge's Motion to the extent it seeks dismissal of Lloyd's hostile work environment claim.

Riveredge asserts that Lloyd has not alleged direct evidence of discrimination, because she does not allege "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." Cole v. Fam. Dollar Stores of Md., Inc., 811 F.App'x 168, 175 (4th Cir. 2020) (citing Taylor v. Va. Union Univ., 193 F.3d 219, 232 (4th Cir. 1999) (en banc)). According to Riveredge, "Plaintiff merely alleges that Mr. Lankford displayed rude behavior and yelled at her and her co-worker on occasion." (Mot. at 8). This is an overly narrow reading of the Amended Complaint. Lloyd alleges, among other things, that Lankford repeatedly made sexist remarks in front of her, despite her requests that he stop doing so. (Am. Compl. ¶ 33). In addition, Lloyd alleges that Lankford exclaimed, "[Y]ou haven't seen me mad! I'm sorry I'm not as good of a man as your husband. But I'm not about to have three WOMEN coming at me while I am trying to explain something!" (Id. ¶ 37). These are examples of statements that directly reflect Lankford's alleged discriminatory attitude.

Moreover, because this is a hostile work environment claim, "there is no facially legitimate action to consider." Stewart v. MTR Gaming Grp., Inc., 581 F.App'x 245, 248 (4th Cir. 2014) (citing Johnson v. Booker T. Washington Broad. Serv. Inc., 234 F.3d 501, 510–11 (11th Cir. 2000)). The "contested employment decision" in a hostile work environment claim, to the extent such a framework can apply to a claim of hostile work environment, is the harassment forming the basis for the claim. Lankford's discriminatory statements to Lloyd were part of and directly related to that alleged harassment. The Court

14

thus finds that Lloyd has presented allegations of direct evidence of discrimination sufficient to survive Riveredge's Motion. Accordingly, the Court will deny Riveredge's Motion to Dismiss Lloyd's hostile work environment claim.

**C.     Retaliation (Count Two)**

Lloyd alleges that Riveredge unlawfully retaliated against her in violation of Title VII. To state a claim for retaliation under Title VII, a plaintiff must allege "(1) that she engaged in a protected activity, as well as (2) that her employer took an adverse employment action against her, and (3) that there was a causal link between the two events." Boyer-Liberto v. Fontainbleu Corp., 786 F.3d 264, 281 (4th Cir. 2015) (en banc) (quoting EEOC v. Navy Fed. Credit Union, 424 F.3d 397, 405–06 (4th Cir. 2005)). An adverse employment action is a discriminatory act that "adversely affects the terms, conditions, or benefits of the plaintiff's employment." James, 368 F.3d at 375 (internal quotation marks and citation omitted). In retaliation cases, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (internal quotation marks and citation omitted). Thus, the burden of establishing an adverse action in a retaliation claim is lower than that of discrimination. See Burlington N., 548 U.S. at 64–67 ("[T]he antiretaliation provision, unlike the substantive [discrimination] provision, is not limited to discriminatory actions that affect the terms and conditions of employment. . . . The scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm.").

Lloyd's retaliation claim is straightforward. She engaged in archetypal protected activity when she complained about the sexual harassment by Cisneros. See Strothers v. City of Laurel, Md., 895 F.3d 317, 328 (4th Cir. 2018) (finding that protected activity under Title VII includes "complaining to superiors about suspected violations of Title VII" (quoting Boyer-Liberto, 786 F.3d at 281)). She suffered an adverse action when Riveredge allegedly subjected her to a retaliatory hostile work environment and then constructively discharged her. See Vedula v. Azar, No. TDC-18-0386, 2020 WL 5500279, at *15 (D.Md. Sept. 11, 2020) ("[T]o prove a retaliatory hostile workplace environment, the plaintiff must show the same elements [as a discriminatory hostile work environment claim] but demonstrate that the harassment was based on prior protected activity." (citing Pueschel v. Peters, 577 F.3d 558, 565 (4th Cir. 2009))). Thus, Lloyd need only plausibly allege a causal connection between the protected activity and the adverse actions she experienced.

"[T]emporal proximity between an employer's knowledge of protected activity and an adverse employment action suffices to establish a prima facie case of causation where the temporal proximity is 'very close.'" Jenkins v. Gaylord Entm't Co., 840 F.Supp.2d 873, 881 (D.Md. 2012) (quoting Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273–74 (2001)). Riveredge argues that the temporal proximity is insufficient here because Lloyd "voluntarily terminated her employment four months after Plaintiff reported the July 30, 2018 Incident." (Mot. at 12–13). Riveredge cites to a Fourth Circuit decision holding that such a lengthy interregnum is too great to infer a causal connection between the protected activity and the adverse action. See Pascual v. Lowe's Home Ctrs., Inc., 193 F.App'x 229, 233 (4th Cir. 2006). However, as set forth above, the actions underpinning Lloyd's hostile

16

work environment claim—which in turn form the basis for her constructive discharge claim—began immediately following her report of harassment. Thus, the temporal proximity between her protected activity and the adverse employment actions she experienced is "very close." See Breeden, 532 U.S. at 273–74; see also Lettieri v. Equant Inc., 478 F.3d 640, 651 (4th Cir. 2007) (finding that evidence of retaliatory animus following a plaintiff's protected activity can show causation even where the temporal gap between the protected activity and the adverse action is substantial). Accordingly, Lloyd's retaliation claim survives Riveredge's Motion to Dismiss.[7]

## IV.   CONCLUSION

For the foregoing reasons, the Court will deny Riveredge's Motion to Dismiss Plaintiff Mikayla Lloyd's Complaint (ECF No. 4). A separate Order follows. Entered this 21st day of June, 2021.

/s/
George L. Russell, III
United States District Judge

---

[7] Because the Court finds that Lloyd plausibly alleges the adverse actions of a hostile work environment and a constructive discharge—and plausibly alleges a causal connection between those actions and her protected activity—it need not reach the question of whether the allegedly retaliatory actions identified in the Amended Complaint, (see Am. Compl. ¶ 66), constitute one or more adverse actions under the Burlington Northern standard outside of the hostile work environment construct, either individually or when viewed together. See, e.g., Jones v. Bd. of Educ. of Putnam Cnty., W. Va., 432 F.Supp.3d 635, 644 (S.D.W.Va. 2020) (viewing retaliatory actions collectively outside the context of a hostile work environment claim); Heggins v. City of High Point, No. 1:16-CV-977, 2017 WL 6514681, at *6 (M.D.N.C. Dec. 20, 2017) (same).